CORN EXCHANGE NATIONAL BANK AND TRUST COMPANY, PETITIONER,
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100805.   Promulgated May 12, 1942.

*Frederick E. S. Morrison, Esq.*, and *John W. Bodine, Esq.*, for the petitioner.

*Brooks Fullerton, Esq.*, for the respondent.

MELLOTT: This is a proceeding for redetermination of a deficiency in income tax for the year 1935 in the amount of $82,969.32. It was submitted upon the pleadings, a stipulation of the parties, and documents received in evidence either without objection or subject only to their competency and materiality. Objection was sustained to the reception in evidence of a preliminary, or 30-day letter, offered by the respondent. All of the facts are found to be as stipulated or admitted; but for present purposes they will be summarized.

The issues are: (1) Is petitioner entitled to deduct from gross income $694,421.77 either as a debt, worthless in whole or in part, under section 23 (k) of the Revenue Act of 1934, or as a loss sustained in carrying out a contract with Union Bank & Trust Co. under section 23 (e) of the same act? (2) Is petitioner entitled to deduct, as debts ascertained to be worthless and charged off, notes aggregating $176,314? (3) Is petitioner entitled to deduct, as debts ascertained to be worthless in whole or in part, or as a loss, its investment in bonds aggregating $182,401.57? and (4) Should petitioner be permitted to exclude from gross income $35,502.03 collected upon debts which had been charged off as worthless and deducted from gross income in prior years but which had not reduced its income tax for any of those years? The issues will be discussed in the order stated.

## ISSUE I.

### *Petitioner's Claim for Bad Debt Deduction of $694,421.77.*

Petitioner, hereinafter sometimes referred to as "Corn Exchange", is a national bank duly organized under the laws of the United States. Its offices and place of business are located in Philadelphia, Pennsylvania. Its income tax returns for 1935 and prior years were filed with the collector of internal revenue at Philadelphia. Its books were kept and its returns were made upon an accrual basis. In 1929, Union Bank & Trust Co., hereinafter referred to as Union, was a Pennsylvania banking and trust company. Both banks were members of the Philadelphia Clearing House Association.

In March 1929 Union attempted to stop a run by borrowing heavily from other banks, and issuing to them its bills payable. Although it borrowed $8,366,000, it was unable to pay in cash the balances due by it on the clearings of March 27, 1929, and the Pennsylvania Department of Banking threatened to close it. Other member banks of the Philadelphia Clearing House Association and the private banking firm of Drexel & Co., in order to protect their interests, urgently requested Corn Exchange to take over the assets and liabilities of Union and to liquidate it. Corn Exchange reluctantly agreed to do so, but

only on condition and subject to the proviso that the clearing house banks, together with Drexel & Co. and the directors of Union, would make good any loss incurred up to a total of $4,000,000.

Under date of March 28, 1929, the following agreement was executed by petitioner and Union:

1. Union Bank hereby sells, assigns, transfers and sets over unto Corn Exchange Bank all its property and assets, real and personal, together with good will and all choses in action, and agrees to make, execute and deliver all such further instruments as may be necessary or desirable to vest title thereto in said Corn Exchange Bank.

2. In consideration of said conveyance and transfer, Corn Exchange Bank hereby agrees to pay all liabilities to creditors of Union Bank, not including, however, liability to stockholders by reason of their holdings of stock.

3. Corn Exchange Bank may at its option sell or otherwise liquidate any or all of the assets so received from Union Bank, or may at any time prior to the sale or other liquidation of any such assets retain any or all thereof for its own use.

4. Corn Exchange Bank agrees to keep an accurate account of all moneys realized from the sale or other liquidation of the assets so received from Union Bank, and to account for the value of any such assets retained by it for its own use (such value to be determined as hereinafter set forth).

5. Corn Exchange Bank agrees to pay to the stockholders of Union Bank, in proportion to their several holdings, an amount equal to the net amount realized from the sale or other disposition of said assets and the value of such of said assets as shall be retained by Corn Exchange Bank for its own use, such payment to be made after the payment of all liabilities to creditors of Union Bank, as above provided, and of all expenses incurred by Corn Exchange Bank in connection with said liquidation, including interest at 6% per annum on all money advanced by Corn Exchange Bank for the payment of liabilities of Union Bank pursuant hereto.

6. The value at which Corn Exchange Bank shall account for any assets of Union Bank retained by Corn Exchange Bank for its own use shall be determined by a majority of a committee, consisting of three directors of Union Bank and three directors of Corn Exchange Bank to be appointed by the respective Boards, who, if they cannot agree, shall name a seventh member of said committee, who shall have the deciding vote. The decision of such committee shall be final and conclusive. Said committee shall, from time to time, as and when requested by Corn Exchange Bank, fix the value of such assets of Union Bank as Corn Exchange Bank may request, and report the same to Corn Exchange Bank within thirty days of any such request.

In the above-mentioned accounting no value whatever shall be placed upon any estate, trust, or other fiduciary matter which shall be taken over by Corn Exchange Bank for its own use and/or in which it shall be substituted as fiduciary for Union Bank, nor shall any credit be allowed to Union Bank upon any fees or commissions allowed in fiduciary matters representing services heretofore performed by Union Bank, unless the same shall have been due and payable upon the date of this agreement; no value whatever shall be placed upon any leases, contracts, good will, or other similar intangible assets taken over by Corn Exchange Bank for its own use.

7. The time and manner of the sale or other disposition of any of the assets taken over by Corn Exchange Bank and the price or other consideration for which same shall be sold or disposed of shall be determined by Corn Exchange Bank

in its uncontrolled discretion. Corn Exchange Bank is hereby authorized to adjust, settle, compromise, release, or otherwise dispose of any choses in action or claims of Union Bank against any person, partnership or corporation whatsoever (including claims against Corn Exchange Bank), as Corn Exchange Bank in its uncontrolled discretion may deem wise. Corn Exchange Bank shall be entitled to pay, settle, compromise or otherwise discharge any and all claims against or liabilities of Union Bank (including claims of or liabilities to Corn Exchange Bank) as Corn Exchange Bank in its uncontrolled discretion may deem wise.

8. Union Bank hereby constitutes and appoints Corn Exchange Bank its true and lawful attorney for and in the name and stead of Union Bank but for the use of Corn Exchange Bank, to demand, sue for, recover, collect, receive, acquit, release and discharge all claims and demands of Union Bank, as fully and effectually to all intents and purposes as Union Bank could or might have done, Union Bank hereby ratifying and confirming all that Corn Exchange Bank shall do or cause to be done in the premises.

9. Union Bank agrees to use its best efforts to have Corn Exchange Bank continued and/or substituted as the fiduciary in all estate, trusts and similar matters in which Union Bank is now the fiduciary and which Corn Exchange Bank desires to retain, and in every way to transfer to Corn Exchange Bank the good will of Union Bank.

10. The certificate of the President and Cashier of Corn Exchange Bank as to the amount payable to stockholders of Union Bank, pursuant to this agreement shall be final and conclusive, and the Corn Exchange Bank shall not be liable for anything whatever in connection with this agreement or in connection with its administration or liquidation of assets of Union Bank or the payment of liabilities of Union Bank, except only for its wilfull misconduct or gross neglect.

11. Corn Exchange Bank shall be under no duty or obligation to assert or enforce or take any action whatever in connection with any claim or demand whatsoever growing out of possible liability of stockholders, directors, or officers, for negligence, malfeasance or other misconduct.

Under date of April 11, 1929, petitioner and Union executed a supplemental agreement reading in part as follows:

1. The property and assets included in the sale from Union Bank to Corn Exchange Bank do not include any claims or demands against stockholders, directors and/or officers of Union Bank as such stockholders, directors and/or officers.

*  *  *  *  *  *  *

3. Corn Exchange Bank may carry upon its books the assets and liabilities of Union Bank at such figure as it may elect. Such book entries shall not be construed to:

(a) charge Corn Exchange Bank with the receipt of any assets which do not actually come into its hand;

(b) operate as an admission by Corn Exchange Bank as to the value of said assets;

(c) limit the property and assets sold and transferred by said agreement of March 28, 1929, as amended by this agreement;

*  *  *  *  *  *  *

In an agreement dated March 28, 1929, the 24 directors of Union agreed to pay Corn Exchange, on demand, up to the amounts set opposite their respective names (total $1,500,000), "any and all loss

which may be sustained in the liquidation of Union." The agreement provided in part:

2. Loss shall conclusively be deemed to have been sustained under this agreement whenever and as often as it shall appear that the assets of 'Union' * * * remaining in the hands of the Corn Exchange Bank, at their fair valuation, * * * are less than the amount which has been paid out or assumed by Corn Exchange * * * in liquidation of the liabilities of Union * * *, and in payment of expenses, * * * plus interest at the rate of six percent per annum on moneys advanced by Corn Exchange Bank, after giving credit for the amount realized from the assets of said Union Bank * * *, which have been sold or otherwise disposed of, plus any amounts theretofore paid by Directors hereunder.

*        *        *        *        *        *        *

Loss shall also be conclusively deemed to have been sustained under this agreement if, when all of the assets of Union Bank * * * shall have been sold or otherwise disposed of, the amount paid out or assumed by Corn Exchange Bank in liquidation of the said liabilities of Union Bank * * * and in payment of expenses authorized by * * * agreements * * * plus interest at the rate of six per cent per annum on moneys advanced by Corn Exchange Bank, is in excess of the amount realized from said assets plus any amounts theretofore paid by Directors hereunder.

An agreement was entered into on April 25, 1929, between Corn Exchange and 26 banks, in which the banks agreed to pay to Corn Exchange, up to the amounts set opposite their respective names (total $2,475,000), any loss sustained by it in excess of the amount paid by the directors of Union, such losses to be determined in the manner provided in the agreement with the directors. Corn Exchange assumed an obligation of $25,000 of a small bank which did not sign this agreement.

On April 12, 1929, pursuant to the above agreements, Corn Exchange took over all of Union's assets and also took possession of Union's places of business and books of account. On the same date Corn Exchange entered on its books as liabilities all the known liabilities of Union, consisting of the following:

| | |
|---|---|
| Bills payable to banks | $8,366,000.00 |
| Christmas savings deposits | 207,621.64 |
| Other deposits | 13,814,618.55 |
| Total | 22,388,240.19 |

All known creditors and depositors of Union were notified that Corn Exchange had taken over the business of Union and would pay, on demand, all of its liabilities with interest. Thereafter Corn Exchange paid these liabilities as demands were made. On its books the Union creditors were credited with the amounts owed to them, and an asset account was set up entitled "Union Bank and Trust Company, in Liquidation." The initial entry in this account was a debit of $22,388,-240.19, which was equal to the total of the liabilities of Union assumed

by Corn Exchange. The debit charge represented the right of Corn Exchange under the agreements to the proceeds from the assets of Union (as distinguished from the notes, bonds and other assets of Union) so taken over, to the extent of (1) all liabilities of Union assumed by Corn Exchange, plus (2) the expenses incurred by Corn Exchange in the liquidation, plus (3) interest at 6 percent on the money advanced by Corn Exchange for the payment of liabilities of Union. On the books of Union its liabilities were charged and closed out and a new liability account opened entitled "Corn Exchange National Bank and Trust Company", to which credit was made in the sum of $22,388,240.19.

On April 12, 1929, Corn Exchange sent to each depositor of Union a letter stating: "You are now a depositor of Corn Exchange National Bank." Corn Exchange increased the reserve which it was required to carry against its deposit liabilities by an amount sufficient to cover the Union deposits, the payment of which it had assumed. Union's depositors were treated in every particular and for every purpose the same as the depositors who had originally made their deposits in Corn Exchange.

The assets of Union, as shown by its books of account on April 12, 1929, consisted of the following:

| | |
|---|---|
| Loans and discounts | $21,772,068.42 |
| Bonds and securities, etc | 4,413,598.75 |
| Miscellaneous assets | 833,164.35 |
| Total | 27,018,831.52 |

Subsequent transactions relating to these assets were recorded by Corn Exchange in the old books of Union. The only assets carried on the books of Corn Exchange were those retained for its own use pursuant to the agreements. As any asset was disposed of by Corn Exchange, or as Corn Exchange elected to retain any asset for its own use, the proceeds or the determined value was credited to the proper asset account on Union's books and charged to and in reduction of the account on Union's books entitled "Corn Exchange National Bank and Trust Company." Any difference between the book value of such assets on the old books of Union and the proceeds of the disposition or determined value was credited (if a loss) or charged (if a gain) solely to the proper asset account on Union's books and charged (if a loss) or credited (if a gain) solely to the profit and loss account on Union's books. After these and other charges (namely, interest at 6 percent and the expenses of liquidation) had exhausted the profit and loss account on Union's books, such charges were made to and in reduction of Union's surplus account, and after the exhaustion thereof, to and in reduction of Union's capital account, which was exhausted in 1931 and ultimately became a large deficit. Any gains or losses aris-

ing from the disposition of, or the retention by, Corn Exchange for its own use of any of the "Union assets" were reflected in the income tax returns of Union only, and not in the income tax returns of Corn Exchange. The returns of Union were executed and filed by the officers of Union Bank & Trust Co., in Liquidation.

Corn Exchange also took over from Union and administered trust, agency, stock transfer, corporate trust, and unfunded insurance trust accounts, for which it received commissions or compensation in the years 1929 to 1940, inclusive, aggregating $28,649.58. These commissions were not credited to Corn Exchange's account "Union Bank and Trust Company, in Liquidation", nor were the expenses incurred in connection therewith charged to this account.

After the initial entry of $22,388,240.19 as an asset in the account on petitioner's books "Union Bank and Trust Company, in Liquidation", the account was from time to time reduced by:

(1) the net amounts realized by sale of Union's assets after April 12, 1929;

(2) the value, determined by the joint committee under the agreement, of assets acquired and retained by Corn Exchange for its own use;

and increased by:

(1) the amounts of the expenses incurred by Corn Exchange in disposing of the Union assets; and

(2) interest at the rate of 6 percent per annum, calculated on the daily debit balance of the account, such interest charge being, however, credited with and reduced by the income actually earned on the remaining Union assets which were undisposed of and not retained by Corn Exchange for its own use.

At the same time that the 6 percent interest charges were made by Corn Exchange against Union, the latter's profit and loss account was charged with identical sums, and these were deducted by Union in its income tax returns for the years 1929 to 1939, inclusive. So, also, the income from Union assets was credited to Union's profit and loss account and reflected in Union's income tax returns as income from assets of Union. Each month the excess of the 6 percent interest charge over the income from the Union assets was added to the amount shown on Union's books as due to Corn Exchange.

On or before April 17, 1929, Corn Exchange paid to various banks the $8,366,000 due from Union to them. On or shortly after December 1, 1929, it paid to Christmas fund depositors the amounts of their deposits, aggregating $207,621.64. The other liabilities of Union assumed by Corn Exchange, consisting of general deposits, certificates of deposit, and savings fund accounts, were paid by the latter when and as demand was made by the depositors in the ordinary course of business. On April 12, 1929, prior to taking over the deposit accounts of Union, the deposits of Corn Exchange were $87,365,828.18. On April 12, 1929, after taking over the deposit accounts of Union, the

deposits of Corn Exchange were $103,726,360.24; on December 31, 1929, $92,993,603.65; and on December 31, 1930, $90,466,569.03.

In the Federal income tax returns of Corn Exchange for the years 1929 and 1930 the respective amounts of $613,370.67 and $521,183.74, being the 6 percent interest charges against Union during those years, were included in gross income. The taxable net incomes reported and the income taxes paid for those years were:

| Year | Taxable net income | Income tax paid |
|------|-------------------:|----------------:|
| 1929 | $1,344,756.79 | $147,923.25 |
| 1930 | 1,017,634.34 | 122,116.12 |

No Federal income taxes were paid by petitioner for the years 1931–1935, its returns for those years showing no taxable net income.

A part of the interest charges made during 1931, or $161,464.08, was included by Corn Exchange as taxable income in its return filed for that year. Interest charges of $238,406.31 made during 1931 were shown on this return as nontaxable income. The latter amount was not reported as taxable income because of the determination of the national bank examiner that it might not be received. Interest charges of $401,146.39 made during 1932 were shown on the return of Corn Exchange for that year as nontaxable income for the same reason.

On November 1, 1932, Corn Exchange and the national bank examiner decided that the interest charges in excess of the income from "Union assets" were uncollectible and that such charges should not be placed on Corn Exchange's own books of account as income but merely carried as memoranda. These memoranda interest charges upon direction of the national bank examiner were recorded, however, on the Union books of account to the credit of Union's account entitled "Corn Exchange National Bank and Trust Company" so as to show the entire amount of the credit balance at any given time. These memoranda interest charges shown on Union's books from November 1, 1932, through 1939, aggregated $1,573,366.30.

The expenses incurred by Corn Exchange in connection with the liquidation of Union were not deducted by it in its income tax returns inasmuch as they were charged by Corn Exchange to the account entitled "Union Bank and Trust Co. in Liquidation" and thereby increased the debit balance of said account.

By the end of 1931 the debit balance in "Union Bank and Trust Company, in Liquidation" exceeded the value of the remaining Union assets as appraised by the national bank examiner, by the sum of $723,432.07. By the end of 1933, this excess amounted to $3,255,813.29. During 1931 through 1933, Corn Exchange notified the direc-

tors of Union and the banks of this situation and that they must pay under their agreements. The payments made by them were as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1931_____ | $30, 837. 50 | 1935_____ | $115, 600. 00 | 1939_____ | $23, 912. 61 |
| 1932_____ | 226, 093. 75 | 1936_____ | 53, 048. 66 | 1940_____ | 12, 500. 00 |
| 1933_____ | 2, 468, 193. 35 | 1937_____ | 26, 911. 18 | | |
| 1934_____ | 115, 000. 00 | 1938_____ | 22, 438. 51 | | 3, 094, 535. 56 |

At the time of the hearing (October 24, 1940) Corn Exchange estimated that an additional $105,014.50 will be received from the directors of Union and from the banks.

From time to time a national bank examiner appraised the assets of Union which had been taken over by Corn Exchange and which had not been disposed of, and as a result of an examination reflected in a report dated March 8, 1934, the bank examiner required Corn Exchange to charge off on its books the difference between: (a) the appraised value which he put upon the remaining assets of Union ($2,672,114.35) plus the estimated recoveries from guarantees ($772,-500) and (b) the debit balance in the "Union Bank and Trust Company, in Liquidation" ($4,095,583.85), or $650,969.58. After considering the bank examiner's report, Corn Exchange "charged off" that amount plus an additional amount of $99,509.57 which it determined was also nonrecoverable, by crediting the total of the two, i. e., $750,479.15 to the account "Union Bank and Trust Company, in Liquidation." In its 1934 income tax return Corn Exchange deducted $750,479.15 as a partial bad debt. (This amount is not presently in issue.)

A national bank examiner made another examination in the summer of 1934. His report on this examination, dated September 6, 1934, was received by Corn Exchange on November 24, 1934. In this report, Corn Exchange was directed to charge off the difference between: (a) the appraised value put upon the remaining assets of Union ($2,186,540) plus the estimated recoveries from the guarantors ($374,105.40) and (b) the debit balance in the account "Union Bank and Trust Company, in Liquidation" ($2,910,822.71), or $350,177.31.

Following the usual procedure, the report of the bank examiner was referred to the board of directors of Corn Exchange on November 27, 1934, which in turn referred it to the examining committee of the board. This committee considered the examiner's report during December, and on December 28, completed its report and therein recommended a charge off of the $350,177.31. On January 2, 1935, the next meeting of the Board, it considered the reports of the examiner and of the committee, and "having then ascertained that the said amount was to that extent non-recoverable and a partial bad debt", directed its officers to make the charge-off. The charge-off was actually made on the books of Corn Exchange on January 4, 1935, by crediting

$350,177.31 to the account "Union Bank and Trust Company, in Liquidation."

On March 21, 1935, the national bank examiner made another examination and report and directed the charge-off of $589,347.08. Corn Exchange, on April 26, 1935, following the same procedure taken in connection with report of November 24, 1934, "ascertained that out of the above $589,347.08 the amount of $344,244.46 was nonrecoverable and a partial bad debt" and charged off this amount against the account of "Union Bank and Trust Company, in Liquidation."

In its income tax return for the year 1935, petitioner claimed as a deduction for "Bad debts" the amount of $1,321,995.57, listing in schedule G attached to the return the various items upon which the deduction was based. Included in this schedule were 52 items ranging in amount from $111 to $195,676, and totaling $694,421.27, which constituted part of the assets of Union taken over by petitioner under the circumstances shown above. Respondent disallowed the deduction of $694,421.27.

Exhibit 4 attached to the stipulation shows that on December 31, 1935, the amounts Corn Exchange was entitled to recover under its interpretation of the agreements, and the amounts realized or to be realized from various sources, were as follows:

| | | |
|---|---|---|
| Liabilities assumed by Corn Exchange | $22, 388, 240. 19 | |
| Expenses incurred under agreements | 547, 020. 23 | |
| 6 percent interest charged by Corn Exchange on daily debit balance in account "Union Bank and Trust Company, in Liquidation" | $2, 233, 861. 90 | |
| Less income from "Union assets" prior to their sale or retention | 971, 986. 85 | |
| | 1, 261, 875. 05 | |
| Proceeds from "Union assets" sold or retained by Corn Exchange | | $18, 136, 412. 81 |
| "Union assets" remaining at end of year per appraisal of National Bank Examiner | | 1, 323, 872. 54 |
| Payments made by directors and banks under their agreements to indemnify Corn Exchange against loss | | 2, 955, 724. 60 |
| Amount unpaid by directors and banks under their guaranties | | 1, 019, 275. 40 |

Respondent disallowed the claimed bad debt deduction upon the theory and now contends that petitioner is not entitled to it because, after April 12, 1929, there was no obligation due from Union to Corn Exchange. Petitioner contends that the transaction between it and Union created the relationship of debtor and creditor, and urges that this relationship is conclusively shown by all the dealings between it and Union, by book entries, and by the uniform construction given to the transaction by the interested parties.

The courts and this Board have often given effect to the rule that where the language of a contract is ambiguous, the practical construction which the parties have placed upon it is entitled to great weight in determining its proper interpretation. This rule has no application, however, where the parties have used language which clearly describes the relationship they intended to create. *National Surety Co.* v. *McGreevy*, 64 Fed. (2d) 899.

Under the agreement of March 28, 1929, Corn Exchange assumed an absolute liability to pay all of the debts of Union in consideration for the sale, assignment, and transfer to it of all the property and assets of Union. Union agreed to execute all instruments necessary to vest title to the assets in Corn Exchange. The supplemental agreement of April 11, 1929, between these two corporations contained the provision that the property and assets included in the "sale" from Union to Corn Exchange did not include any claims or demands against stockholders, directors, and/or officers of Union as such. Any surplus realized was to be turned over to the stockholders of Union. The Circuit Court of Appeals for the Eighth Circuit, in *First National Bank* v. *Harris*, 27 Fed. (2d) 117, described a similar transaction as "an out and out sale of assets in consideration of an assumption of liability with an accounting over for any surplus realized." We think it is also quite significant that in *Perlberg* v. *Union Bank & Trust Co.*, 6 Atl. (2d) 563 (May 25, 1939), involving an action for a writ of mandamus brought by a stockholder of Union to compel defendants (Union and Corn Exchange) to produce for examination all the books of Corn Exchange to determine whether there had been any mismanagement in liquidating the assets of Union, the Supreme Court of Pennsylvania, in reciting the facts, stated: "The assets of Union Bank were purchased by the Corn Exchange National Bank and Trust Company, pursuant to written agreements entered into between the two banks on March 28, 1929, and on April 11, 1929." The agreements seem to justify such a finding.

Apparently realizing that the language of the agreements does not support its contention, petitioner stresses what it terms to be the practical construction of the parties. On brief it states that from the inception of the transaction down to the present date, all participants in it, including Corn Exchange and Union, the 24 directors of Union, and the 26 other participating banks, have uniformly construed it as immediately giving rise to a debt from Union to Corn Exchange, and have treated this debt as from time to time reduced by the amounts realized by Corn Exchange from the sale of Union assets and by sums from time to time determined by the committee to be the fair value of the assets retained by Corn Exchange for its own use, increased by the expenses incurred by Corn Exchange, and by

the agreed 6 percent interest charge on the daily debit balance of the account, less the income realized from the assets prior to such sale or retention.

Petitioner's argument that the participants in the transaction have uniformly construed it as giving rise to a debt from Union to Corn Exchange is not persuasive. It is predicated largely upon entries made in the books of Corn Exchange and Union after April 12, 1929, and upon payments made by the directors and banks. In this connection, however, it should be borne in mind that Corn Exchange, on April 12, 1929, took over not only the assets of Union, but also its places of business and books of account. The accounts set up in those books and the entries made therein after that date are merely indicative of the method by which petitioner sought to record the transaction. They do not reflect any construction or interpretation on the part of Union, its directors, or the banks. The fact that Corn Exchange may have made entries or set up accounts reflecting a debtor-creditor relationship, when none in fact existed, does not alter the nature of the transaction. The directors and banks merely agreed to indemnify Corn Exchange against loss to the extent that the liabilities assumed, expenses incurred, and interest on moneys advanced for the payment of liabilities, exceeded the amount realized from the sale of assets taken over by Corn Exchange and the value of any assets it decided to retain for its own use. They did not agree to pay any debt of Union. The fact that they made payments as agreed, when notified by Corn Exchange that it had sustained a loss, is no indication that they construed the transaction as petitioner contends. On the contrary, such payments indicate that they knew and realized that Union and its stockholders were relieved of all liability under the provisions of the agreements of March 28 and April 11, 1929, that no payments could be expected from this source, and hence that the loss would be substantially as set up by petitioner on its books; but there was no debt due from Union.

"The term debt denotes an obligation of the debtor to pay and a right of the creditor to receive and enforce payment." *Emil Weitzner*, 12 B. T. A. 724, 725; *Harry Lee Martin*, 33 B. T. A. 340, 341. Under the stipulated facts all obligation of Union and its stockholders to Corn Exchange ceased when the latter took over Union's assets and assumed its liabilities. That, it may be assumed, was the reason Corn Exchange took no action against Union or its stockholders when it became apparent that a loss would be sustained, but proceeded to collect from the directors and banks to the extent of their liability under the contracts. This conclusion accords with the view apparently taken by petitioner when its income tax returns for 1934 and 1935 were filed; for, while it claimed deductions for bad debts, it did not list any debt owing to it from Union.

Cases cited and relied upon by the petitioner, such as *Hightower* v. *American National Bank of Macon*, 263 U. S. 351, and *Wyman* v. *Wallace*, 201 U. S. 230, holding that under the facts a debtor-creditor relationship had been created when one bank took over the assets and assumed the liabilities of another, are distinguishable upon their facts. In *Wyman* v. *Wallace* the bank which assumed the liabilities of the other had accepted three nonnegotiable notes signed by it. The question was whether the stockholders were liable for the payment of the notes under what may be referred to as the "double-liability" section of the banking act. The Court held that they were, since the notes were valid obligations of the bank. In *Hightower* v. *American National Bank of Macon* the Court construed the contract signed by the two banks as creating the relationship of debtor and creditor and pledgor and pledgee, pointing out that the one bank was "to hold the assets 'as security' for 'all advances' made by it to pay liabilities and expenses; that it was to reduce the assets to cash with reasonable diligence and apply the proceeds in 'repaying' 'all amounts advanced' by it 'with interest' added, and that if, for any reason beyond its control, the liquidation should be discontinued, it should hold the assets 'as security' for its 'advances' up to that time." Another significant provision of the contract was one directing that the surplus, if any, be paid over to the stockholders of the bank being liquidated, with a concomitant provision that the shareholders should not be relieved of their liability as such. In the instant proceeding, while petitioner had agreed to pay over to Union's stockholders any surplus, the failure to incorporate in the contract a provision making Union or its stockholders liable for any deficiency and the execution of the supplemental contract specifically providing that petitioner should have no claim against Union's stockholders, directors, or officers indicate quite clearly that it was intended that the relation of debtor and creditor should not exist. Nor was petitioner a mere pledgee of the assets. The whole contract, as exemplified in the various agreements, amounted to this and nothing more. Corn Exchange was given assets having a nominal value of $27,018,831.52 with which to liquidate liabilities of $22,388,240.19. Anticipating that the real value of the assets would not be equivalent to the nominal value, Union's directors agreed to protect Corn Exchange against loss to the extent of $1,500,000 and the banks signing the other contract agreed to protect it against loss, in excess of the amount paid by the directors of Union, to the extent of an additional $2,475,000. It may be that petitioner sustained a loss in excess of the aggregate of these amounts; but that is not the question before us. Nor are we called upon to decide whether the amounts not paid by the directors were bad debts. Our question is the narrow one: Was Union a debtor of Corn Exchange? Being of

the opinion that this question must be answered in the negative, petitioner's claim for the deduction of the bad debt must be denied.

In reaching the conclusion set out above we have not overlooked other evidence relied upon by petitioner or points stressed by it upon brief. It places considerable reliance upon a letter received from a bank examiner a few days before the hearing in which it is stated that the examiners had always "viewed the asset carried on * * * [petitioner's] books as an advance to the Union Bank and the assets pledged the same as collateral to any other loan." In so far as the statement is a legal conclusion it is not binding upon us; and an examination of the action actually taken by the banking department supports the conclusion we have reached rather than petitioner's present contention. In March of 1934 the examiners decided that the assets of Union yet remaining to be disposed of would yield $2,672,114.35 and that petitioner might reasonably expect to collect from the directors of Union and from other banks an additional $772,500. They therefore simply directed petitioner to include in its assets no more than the agregate of these amounts. In November of the same year they appraised the assets again, determined that they would yield $2,186,540, estimated that additional collections from the directors and the banks in the amount of $374,105.40 would be made, and directed that henceforth there be carried as an asset no more than the aggregate of these two amounts. Regardless of how the bank examiner may characterize his action, we construe it as no more than an order to write down an asset from its nominal or carried value to its real value.

In its amended petition, petitioner makes the alternative contention that if the bad debt deduction is denied, then it is entitled to deduct the amount of $694,421.77 as a loss. This contention, though mentioned by petitioner in its briefs, is not discussed. Respondent, however, discusses it at length. He urges that no loss deduction should be allowed for 1935 because the transaction was not completed and closed before the end of that year. He points out that assets having an appraised value of $1,323,872.54 then remained unsold and that the interest item constituted all, and more, than the claimed loss. He also argues that the interest was not computed correctly by the petitioner because it included in the computation interest upon sums not actually paid out until months after April 12, 1929; that since a correct computation of the interest was not made it was impossible to ascertain, on December 31, 1935, that a loss had been sustained or that there ever will be a loss; that the deposit accounts of more than $13,800,000 and the trustee accounts acquired by petitioner had some value, and, because of the failure of petitioner to prove their value or to prove that they had none, the amount of any loss sustained can not be determined.

Petitioner's failure to discuss its alternative contention may be due to the fact that it realizes a loss must be evidenced by a closed transaction—a situation not present here. At the end of the year 1935 petitioner could only guess at the amount of loss, if any, which would actually be sustained. At that time it had Union assets having an appraised value, as pointed out by respondent, of $1,323,872.54 which had not been sold, and it could not then determine the amount which would eventually be realized from their sale. It did not know what the total expense of liquidating the assets would be, nor what amount would eventually be paid by the directors and banks under their contracts of indemnity. Obviously the transaction had not reached that stage of completion which would enable petitioner to state definitely the exact amount of its total loss. There is no statutory authority for the allowance of a partial loss.

While the amount in issue may not be allowed as a deduction from gross income in 1935 either as a bad debt or as a loss, we pass without decision the question whether petitioner ultimately sustained a loss and, if so, how it should be computed. We hold only that respondent committed no error in disallowing the claimed deduction in the year before us.

ISSUES II AND III.

*Bad Debt Deduction, $176,314 Bills Receivable, and $182,401.57 Bonds.*

The present issues are not connected with, nor do they arise from, the Union transaction. They involve claimed bad debt deductions aggregating $358,715.57 for bills receivable and bonds in the amounts shown in the subheading and may be considered together as one issue. The facts (exclusive of the steps taken as set out in paragraph 5 (f) which will be summarized) are shown in paragraphs 9 to 13, inclusive of the stipulation, as follows:

9. During the years 1934 and 1935, Corn Exchange owned bills receivable due from Albert Company, C. Albert Kuehnle, Bryn Bella Land Company, and Pennsylvania Carpet Company. As a result of an examination begun in September, 1934, and in respect of which a report was received by Corn Exchange on November 24, 1934, the National Bank Examiner ordered the charging off of the above mentioned accounts in the amounts as follows:

| | |
|---|---|
| Albert Company | $100,000 |
| C. Albert Kuehnle | 30,000 |
| Bryn Bella Land Company | 16,314 |
| Pennsylvania Carpet Company | 30,000 |
| | 176,314 |

Of this amount of $176,314, the said Examiner ordered the charging off of the $30,000 due from C. Albert Kuehnle as wholly worthless, and ordered the charging off of the amounts shown from the three other accounts, respectively, because they were partially non-recoverable in the respective amounts shown above.

10. During the years 1934 and 1935 Corn Exchange owned certain bonds. As a result of an examination begun in September, 1934, and in respect of which a report was received by Corn Exchange on November 24, 1934, the National Bank Examiner ordered the charging off of said bonds to the extent of $182,401.57. Of this amount the said Examiner ordered the charging off of certain of these assets as partially non-recoverable in the amount of $50,150.50, and ordered the charging off of the balance of these assets as wholly worthless in the amount of $132,251.07.

11. Pursuant to Corn Exchange's usual procedure, the same steps were taken by Corn Exchange (to ascertain and charge off the bad debts of $176,314 and $182,401.57 aforesaid) as are set forth in paragraph 5 (f) on pages 20 and 21 supra. Accordingly, Corn Exchange, having ascertained said bills receivable and said bonds to be worthless in whole or in part as noted above, charged the same off in 1935 on its books of account to the extent of the amounts ordered to be charged off by the National Bank Examiner's report, as aforesaid.

12. On April 14, 1935, Corn Exchange filed its Federal corporation income and excess-profits tax return for the calendar year 1934 with the Collector of Internal Revenue for the First District of Pennsylvania at Philadelphia, Pennsylvania, disclosing a net loss of $211,786.61, which was further increased, by the deduction of tax exempt income, to a loss of $512,842.08. On said return Corn Exchange deducted from gross income, as bad debts, the amount of $1,145,613.82. Neither the sum of $176,314 nor the sum of $182,401.57, nor any part of either of these sums, was included in the deductions reported as bad debts on Corn Exchange's return for the calendar year 1934. On its said 1934 income tax return Corn Exchange deducted $750,479.15 as a partial bad debt in respect of the liquidation of the Union Bank and Trust Company as set out in paragraph 5 (e) supra.

13. On March 14, 1936, Corn Exchange filed its Federal corporation income and excess-profits tax return for the calendar year 1935 with the Collector of Internal Revenue for the First District of Pennsylvania at Philadelphia, Pennsylvania, disclosing net income of $201,026.27, which was reduced, by the deduction of tax exempt income, to a net loss of $122,343.54. On said return Corn Exchange deducted as bad debts the amount of $1,312,995.57. Said deduction of $1,312,995.57 reported on Corn Exchange's return for the year 1935 included said sums of $176,314 and $182,401.57.

Summarizing the steps taken, after the report of the bank examiner was received by petitioner on November 24, 1934, it was submitted to the board of directors then in meeting and by it referred to an examining committee. The committee met from time to time in December and on December 28, 1934, prepared a recommendation that the charge-off be made. This was referred to the Board at its next meeting, January 2, 1935. On that date the committee's report and the examiner's report were considered by the board, which directed that the amount be charged off. On January 4, 1935, petitioner, having then ascertained that the said amounts were not recoverable or were recoverable (as to some of the items) only in part, charged them off upon its books.

Under section 23 (k) of the Revenue Act of 1934 debts ascertained to be worthless and charged off within the taxable year are to be allowed as deductions from gross income. "In order to secure a deduction of a debt as worthless, a taxpayer must ascertain its worthlessness, charge it off on his books, and take his deduction all during the same

taxable year." *American Cigar Co.* v. *Commissioner*, 66 Fed. (2d) 425; certiorari denied, 290 U. S. 699. Cf. *Mayer Tank Manufacturing Co.* v. *Commissioner*, 126 Fed. (2d) 588.

Respondent concedes that petitioner charged off the debts in question on its books during the year 1935. He argues that it is not entitled to the claimed deductions because ascertainment of worthlessness occurred in 1934 rather than in 1935. We do not agree. While the order of the bank examiner indicates that the debts were probably worthless in the latter part of 1934, petitioner is entitled to make a reasonable investigation to ascertain whether they are in fact worthless. *Quinn* v. *Commissioner*, 111 Fed. (2d) 372. Its board of directors decided to make such an investigation, and, in accordance with its usual procedure, referred the bank examiner's report to its examining committee for recommendation. This committee considered the report and recommended that the debts be charged off. The recommendation of the committee and the report of the bank examiner were considered by the board at its next meeting on January 2, 1935, the recommendation was approved, and the charge-off was made. All of these acts occurred in 1935. Under similar circumstances it was held in *Sonora Bank & Trust Co.*, 7 B. T. A. 66, that the deduction should be allowed. We accordingly sustain the petitioner upon this issue and hold that the respondent erred in denying the claimed deduction.

## Issue IV.

### *Inclusion in Gross Income of Amount Collected on Debts Charged Off in Earlier Years.*

The final question is whether petitioner is entitled to exclude from its gross income for 1935 $35,522.03 representing recoveries in that year on debts which had been ascertained to be worthless and charged off during the years 1931 to 1934, inclusive. The stipulation on this issue is as follows:

15. During the year 1935 Corn Exchange received recoveries on account of various debts owing to Corn Exchange, which debts had been ascertained to be worthless and had been charged off its books of account in prior years, as follows:

| Year of ascertainment of worthlessness and charge-off | Amount charged off (and subsequently recovered in 1935) |
| --- | --- |
| 1931 | $8,716.41 |
| 1932 | 12,829.37 |
| 1933 | 11,192.07 |
| 1934 | 2,794.18 |
| | 35,532.03 |

These bad debts were claimed as deductions on Corn Exchange's income tax returns as filed for said respective years of charge-off, but no reduction in income tax for those years resulted from such deductions because Corn Exchange's returns for those years show no net income but rather net losses substantially in

excess of the amounts so charged off, respectively. Said total amount of $35,532.03 so recovered in 1935 was included by Corn Exchange in its taxable income as reported on its income tax return for 1935, and respondent has made no adjustment with respect thereto.

Petitioner is sustained upon this issue on the authority of and for the reasons stated in *Central Loan & Investment Co.*, 39 B. T. A. 981; *National Bank of Commerce of Seattle*, 40 B. T. A. 72; affd., 115 Fed. (2d) 875; *Estate of Charles H. Robinson*, 46 B. T. A. 943 and cases cited therein.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH, dissenting: I can not agree with the result reached in the majority opinion that the bad debt deduction of $694,421.27 claimed by the petitioner in 1935 is not a legal deduction from gross income. The basis for the disallowance is that no debtor-creditor relationship existed between petitioner, Corn Exchange, and Union in respect of the account in which the charge-off was made. Of course, the existence of a valid enforceable debt is essential to a bad debt deduction. It is my opinion that the account which petitioner carried in its books in 1934 and 1935 as an account receivable from "Union Bank and Trust Company, in Liquidation" and against which petitioner charged off the respective amounts of $750,479.15 and $694,421.27 in those years, at the direction of the national bank examiner, constituted a valid debt. The charge-off made in the taxable year 1935, I think, was fully justified, since it was ordered by the national bank examiner.