Stewart E. Earle v. Commissioner. G. Harold Earle v. Commissioner.
Earle v. Commissioner
Docket Nos. 18541, 18542.
United States Tax Court
1950 Tax Ct. Memo LEXIS 2; 9 T.C.M. (CCH) 1181; T.C.M. (RIA) 50318; December 29, 1950
G. E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., for the petitioners. G. T. Donoghue, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion These proceedings were consolidated for hearing. In Docket No. 18541 the respondent determined a deficiency, in income tax for 1944, *3 of $19,080.84 for Stewart E. Earle. In Docket No. 18542 the respondent determined a deficiency, in income for 1944, of $16,177.22 for G. Harold Earle. The principal issue is whether each petitioner sustained an ordinary loss in 1944 in a transaction entered into for profit. The respondent urges that the loss in both cases should have been deducted in 1942 and not in 1944, as the petitioners contend. The respondent urges in addition that, if the loss were sustained in 1944, it was a long term capital loss resulting from a sale or exchange of capital assets. Findings of Fact Petitioners are brothers residing at Hermansville, Michigan. Their income tax returns for 1944 were filed with the collector of internal revenue for the district of Michigan. During 1944, and for many years prior thereto, Wisconsin Land and Lumber Company was a corporation engaged in manufacturing lumber and allied products at Hermansville, Michigan. Since 1923, G. Harold Earle was president and Stewart E. Earle vice-president of the corporation. Throughout this period the petitioners owned in equal amounts all except some 500 shares of the corporation's outstanding stock of more than 80,000 shares. G. R. *4 Empson was a lawyer who represented the petitioners and the corporation. National Automobile Owners' Inter-Insurance Association (referred to herein as the Association) was organized under the laws of the State of Michigan, and was thereafter also licensed to do business in Minnesota. It was a reciprocal insurance exchange, through which subscribers for insurance undertook to indemnify each other against certain kinds of losses connected with automobiles. The Association, comprising the subscribers, acted through an attorney-in-fact and operated under an attorney-in-fact agreement, which each subscriber executed. By this agreement, G. R. Empson was designated attorney-in-fact. Following his death, he was replaced in 1938 by his son L. N. Empson. The agreement authorized the attorney-in-fact, subject to limitations appearing therein, to exchange specified kinds of insurance in behalf of the subscribers; to effect reinsurance; to adjust and settle losses; to institute, participate in and settle legal proceedings; to collect monies; and to take other described action with respect to the contracts of indemnity. The agreement empowered him, as compensation for his services, to retain *5 35 per cent of the annual premium deposits, in consideration for which he agreed to defray all expenses incident to the business of the Association except certain specified items. The agreement required that there be an advisory committee, to be composed of subscribers. The committee was given the power to fill vacancies in its membership, to adopt rules and regulations governing the basic operations of the Association and the duties of the attorney-in-fact, to direct the deposit and investment of premiums collected, to control the investment of the reserve fund, and to approve the transfer of the office of the attorney-in-fact from Gladstone, Michigan, to any other place. G. Harold Earle was a member of the advisory committee in 1925 and from 1927 to 1942; Stewart E. Earle was a member for one year. Neither petitioner was familiar with its functions, or attended any meetings, or performed any duties whatever in connection with the committee. G. Harold Earle was aware that his membership on the committee lent support to the Association. In June, 1923, petitioners, at the request of G. R. Empson, made available to the Association negotiable bonds in the aggregate principal amount *6 of $75,000, in order that it might comply with certain laws of Michigan and Minnesota relating to such insurance business. Each petitioner advanced one-half of the total face amount. By a document dated June 2, 1923, petitioners agreed not to withdraw the bonds until all the liabilities of the Association had been paid, provided that the bonds could be withdrawn to the extent that the net surplus of the Association would not be reduced below $75,000. In return, the Association, through G. R. Empson, agreed that (1) the interest on the bonds would be paid to petitioners; (2) in addition, it would pay to petitioners 2 per cent per annum on the total principal amount of the bonds; and (3) it would issue insurance at a discount to petitioners, members of their families, the lumber company and its employees. The discount was to be taken out of the commissions which would otherwise be due to G. R. Empson. From time to time, petitioners substituted other comparable bonds for those originally advanced, but the total principal amount on deposit remained undiminished. The Association never accumulated a $75,000 surplus, and never returned any of the bonds to petitioners except when other bonds *7 were substituted. In its annual statement for 1939 filed with the Commissioner of Insurance of Michigan, the Association reported a loss on operations of $26,041.28, and a surplus of $30,970.78 at the close of the year. The statement indicated that additional capital of $25,000 had been contributed to the Association during the year. The comparable statement for 1940 disclosed a loss of $14,759.47, and surplus of $18,201.08 at the close of the year. The annual statements for 1939 and 1940, in accordance with requirements of Michigan law, excluded from net worth, as "assets not admitted", premiums which were more than 90 days overdue, although such assets may have some value. No statement was filed for 1941, because the Michigan Commissioner of Insurance had taken over the affairs of the Association in February, 1942, prior to the day when such statement was due to be filed. However, a joint report prepared by the Departments of Insurance of Michigan and Minnesota, as of February 9, 1942, covered the period from January 1, 1941, to February 9, 1942, and disclosed "Admitted Assets" in the amount of $140,089.10, "Liabilities" in the amount of $191,217.19, and a resulting "Deficiency *8 as Regards Policyholders" in the amount of $51,128.09. [1] The report showed THAT AMONG THE ADMITTED ASSETS OF THE Association were $101,100 in bonds; that $50,000 of these bonds had been deposited with the Treasurer of the State of Michigan; and that an additional $50,000 had been pledged as collateral for loans. In addition, it appeared that of eight bank accounts maintained by the Association, two had been overdrawn and one (with the largest balance, $3,630.21) had been pledged in large part as security for a loan. Moreover, the attorney-in-fact had failed to file with the Commissioner of Insurance, as required by Michigan law, a bond in the amount of $50,000 to protect subscribers against loss due to any of his illegal or dishonest acts. The report attributed the financial condition of the Association "to very bad bookkeeping practices, poorer underwriting and bad management, together with sharp business practices, exceedingly high costs in the adjusting of claims and the failure to comply with statutory requirements". *9 Upon learning the difficulties confronting the Association, the Departments of Insurance of Michigan and Minnesota issued orders prohibiting the Association from writing insurance thereafter. The Michigan Commissioner of Insurance then filed a petition for his appointment as conservator of the Association to manage its business and conduct its affairs. He stated that in his opinion the Association was insolvent and should not be permitted to operate in its then financial condition. On February 10, 1942, an order was issued by a Michigan court granting the petition. On May 22, 1942, again on the petition of the Michigan Insurance Commissioner, a Michigan court issued an order dissolving the Association and appointing him permanent receiver. The petition to the court stated that there were a large number of unsettled and unadjusted claims outstanding against the Association; that some claims had been adjusted but remained unpaid because of lack of funds; that one of the principal assets of the Association was represented by the unpaid accounts due from policyholders and agents, the amount of which was extremely doubtful and uncertain; and that notices of cancellation of policies *10 had been sent to subscribers to prevent accrual of additional liabilities. In February 1942, the unpaid claims under policies issued by the Association had amounted to $85,647.11. By December, 1942, such claims had increased to $149,576.55. Subscribers of the Association were subject to an assessment of one additional premium. Such an assessment, in the total amount of $127,000, was levied in June, 1946, against policyholders of the Association as of January 1, 1941. Final collections on this assessment were made by March, 1949, and amounted to $40,819.95. During 1942 it became necessary to sell some of the securities which had been pledged as collateral for loans by the Association. To pay such obligations, the conservator sold bonds in the total principal amount of $25,000. The bonds thus sold represented a portion of the securities which had been advanced by the petitioners to the Association. The remaining $50,000 of bonds advanced by them remained on deposit with the Treasurer of Michigan as a guarantee fund for the benefit of subscribers, as required by Michigan statute. In their Federal income tax returns for 1942, petitioners Stewart E. Earle and G. Harold Earle claimed *11 and were allowed ordinary losses of $12,919.54 and $12,930.47, respectively, based on their shares of the cost of the $25,000 of bonds sold by the conservator in that year. In explanation of the deduction, each stated in his return that the securities "were sold by the State Commissioner of Insurance to satisfy bank loans of the Company. The company was found to be insolvent with no possible chance of any recovery on any of the securities sold". In the same returns petitioner Stewart E. Earle reported net income of $21,107.66 and petitioner G. Harold Earle reported net income of $16,151.11. In 1942 the petitioners had been informed of the insolvency of the Association, and knew that it had ceased issuance of policies and that a receiver had been appointed for it. The petitioners believed, in 1942, that there was no chance of recovering anything on the $25,000 in bonds sold by the conservator in that year. But they hoped there would be some recovery on the remaining $50,000 in bonds they had advanced to the Association. During 1943 the Insurance Commissioner made further sales of bonds which had been advanced by petitioners, in the total face amount of $7,000, and used the proceeds *12 to pay expenses of the receivership. In 1943 the petitioners knew of the sale of these bonds, but they did not claim a deduction with respect to them in their 1943 income tax returns. They now concede, however, that such deduction should have been made. In August, 1942, a Michigan court order fixed a 90-day period for the filing of claims by creditors. Thereafter the receiver for the Association sent notices to creditors for the proof of claims. The petitioners failed to file any claim within this period. But prior to December, 1942, they negotiated for the return of the bonds advanced by them to the Association, and these negotiations continued from time to time until February, 1944. Petitioners thereafter received permission from the court to file a late claim, and in February, 1944, filed a claim for $75,000, plus interest, on account of their loan to the Association of $75,000 in bonds. The receiver filed objections to the claim in 1944, relying in part on the writing dated June 2, 1923, referred to above, in which petitioners agreed not to withdraw the bonds unless the liabilities of the Association had been paid or such withdrawal would not reduce the Association's surplus *13 below $75,000. The receiver also asserted that the petitioners, as members of the advisory committee of the Association, were derelict in their supervision of the Association's affairs. A conference was held on December 12, 1944, between petitioners' attorneys and the deputy receiver, at which the attorneys were shown the foregoing writing of June 2, 1923. It was agreed to withdraw the petitioners' claim provided the Association relinquished any claim it might have against them in respect to the operation of the Association or for assessments on certain policies. A stipulation to that effect was executed on December 12, 1944, and a court order of the same date was entered on the stipulation. The court order approved and adopted the stipulation, and disallowed the petitioners' claim. In their 1944 Federal income tax returns, petitioners claimed ordinary losses based on $50,000 in bonds they had advanced to the Association. On the basis of the cost of the bonds to them, Stewart E. Earle claimed a deduction of $24,373.53 and G. Harold Earle claimed a deduction of $24,373.55. In connection with their concession that deductions should have been taken for 1943 for the $7,000 in bonds *14 sold in that year, the petitioners now also concede that the amount of the total loss claimed in the 1944 returns should be reduced on account of the $7,000 in bonds sold in 1943. The respondent disallowed these deductions. He relied on a revenue agent's report which regarded the petitioners as entitled instead to deductions under Section 23 (k) (4) for non-business bad debts which had become worthless in 1944. A deduction of this kind would not reduce petitioners' 1944 tax liability because it gave rise to a short term capital loss, and each of the petitioners had already claimed a net capital loss deduction of $1,000, the maximum allowable for that year. Opinion RAUM, Judge: The deficiencies determined by the respondent were based on two adjustments in the 1944 income tax return of each petitioner. Only one of these adjustments is in dispute, and it involves disallowance of a deduction, under Section 23 (e) (2) of the Internal Revenue Code, [2] for a loss on a transaction entered into for profit. The explanation given by the respondent for the disallowance was that the deduction should have been taken, under Section 23 (k) (4) of the Code, as a non-business *15 bad debt which became worthless in 1944, thereby being deductible only as a capital loss.the respondent now abandons the non-business bad debt theory, and argues that the disallowance was proper because the loss was sustained in 1942 rather than 1944. On this issue, of the year in which the loss was sustained, the petitioners contend that the shift in the respondent's ground for disallowance gives rise to a corresponding shift to the respondent of the burden of proof. We find it unnecessary, however, to pass on this contention. Without regard to a change in the burden of proof, the facts before us show that the petitioners were justified in claiming their loss in 1944. The transaction, out of which *16 petitioners' loss arises, consisted of a loan by them to the Association of bonds in the face amount of $75,000. Under the terms on which the loan was made, they were allowed to recover those securities when (1) all the liabilities of the Association had been paid, or (2) the withdrawal would not leave the Association with a surplus of less than $75,000. In 1942 neither of these conditions existed, and it was plain, by the end of 1942, that it was highly improbable that either of these conditions would ever materialize. The prior three-year period had been marked by substantial losses for each year; liabilities in February, 1942, exceeded assets by about $50,000; between the beginning and the end of 1942, claims against the Association had grown from about $86,000 to about $150,000, an increase of about $64,000. The Association's condition was so serious in 1942 that the Commissioner of Insurance of the State of Michigan found it necessary to obtain an order for the dissolution of the Association and his appointment as its permanent receiver. An objective examination of the Association's circumstances at the end of 1942 could leave no reasonable hope that the right to withdraw the *17 bonds would thereafter ever come into being. But it does not follow, from the facts before us, that the petitioners could not reasonably expect to salvage something on account of the bonds which they had made available to the Association. When it became evident that their property had been permanently appropriated to the use of the Association, they were entitled to believe that they acquired a non-preferred money claim which they could assert as creditors. The respondent has referred us to no authority which would bar such a claim, and in the absence of clear authority to the contrary, it was not unreasonable for petitioners to take the position that the claim could be advanced with some degree of success. Although the Association was insolvent, it had some assets in 1942 that could be divided among creditors. True, the assets pledged as collateral for loans and the $50,000 in bonds deposited as a guarantee fund with the State of Michigan were not available towards satisfaction of petitioners' claim. There remained, however, a substantial asset in the form of premiums owed to the Association, amounting to approximately $23,000. There was also some $17,000 owed to the Association *18 as premiums more than 90 days overdue; and while these were excluded in the Association's financial statements as "assets not admitted", it was possible that a portion of these overdue premiums might be paid. Other unpledged assets, lesser in amount, included a claim of about $7,500 against the attorney-in-fact for overdrafts by him; $1,100 in bonds; and a small amount of cash. Moreover, each subscriber was subject to an assessment of one additional premium. Such an assessment was made subsequently in the amount of $127,000, and actually produced about $40,000. Some uncertainty may have existed as to whether amounts realized on such assessments would be available to meet petitioners' claim, since that claim arose out of assets supplied for a fund for the subscribers' benefit. But no issue has been raised as to this point and nothing has been shown that would preclude petitioners from sharing in the proceeds of such assessments. Thus, there were on hand assets or potential assets in 1942 out of which petitioners could, with some plausible basis, expect to salvage a portion of their original investment in the bonds. But the amount that petitioners might recover was still an unsettled *19 matter in 1942. This was so not only because of possible invalidity of petitioners' claim but also because of uncertainty as to the total amount that would be realized on the assets and the total amount of the other liabilities with which they would have to share those assets. In 1942 there had not yet been "reached that stage of completion which would enable [petitioners] to state definitely the exact amount of [their] total loss. There is no statutory authority for the allowance of a partial loss". Corn Exchange Nat. Bank & Trust Co., 46 B.T.A. 1107, 1121; cf. Arthur Webster, 6 T.C. 1183; W. A. Dallmeyer, 14 T.C. 1282, 1291 et seq. The uncertainty as to the extent of petitioners' loss continued until 1944. In that year petitioners entered into a stipulation with the receiver for the Association in which each party released certain claims being asserted against the other. The receiver released the petitioners from all claims pertaining to their advance of the bonds, [3] their potential liability for dereliction as members of the advisory committee, and, except for specified amounts, their liability as subscribers for assessments. The *20 petitioners, in turn, released all claims they might have against the Association, including any claims relating to the loan of the bonds. Thereafter a court order was entered on the stipulation, approving and ratifying it and disallowing the claim filed by the petitioners with the receiver in connection with the bonds they had loaned the Association. At that time it became settled that the petitioners would not receive anything on those bonds, and their loss then became fixed. In 1944 there were definitive events which established the loss as sustained in that year. n4 *21 The respondent makes only one further objection to allowance of the deductions as ordinary losses in 1944. He argues that, if the loss be treated as sustained in 1944, it resulted from a "sale or exchange" of capital assets held for more than six months. Such a loss, under sections 23 (g) and 117 of the Code, would be a long term capital loss rather than an ordinary loss. The "sale or exchange" is alleged to have been made under the stipulation executed in 1944, in which the Association's receiver and the petitioners mutually released claims they were asserting against each other. That stipulation, as the court order entered on it states, was no more than "an agreement for the compromise, settlement and adjustment of their several claims and demands in controversy". The stipulation itself refers to "release and discharge" of those claims and demand. Such a mutual release or surrender of claims does not constitute a "sale or exchange". Hale v. Helvering, 85 Fed. (2d) 819 (C.A.D.C.); Bingham v. Commissioner, 105 Fed. (2d) 971 (C.A. 2); Spencer Thorpe, 42 B.T.A. 654; Charles E. McCartney, 12 T.C. 320; or Fairbanks v. United States, 306 U.S. 436. *22 There is even less ground for finding a "sale or exchange" in the instant case than in the cases cited, since in those cases, unlike the situation before us, there was a payment of money or a conveyance of property by at least one of the parties involved. Since no "sale or exchange" took place, the capital loss provisions are inapplicable. Decision will be entered under Rule 50. Footnotes
1. The assets and liabilities of the Association as of February 9, 1942, were summarized by the report as follows: ↩
LEDGER ASSETS
Book value of bonds
$101,100.00
Cash collections (not deposited)
$ 157.15
Petty cash account
50.00
Deposits in trust companies and banks
2,933.46
3,140.61
Gross premiums in course of collection: On policies or renewals effective on or after October 1,
1941
23,179.26
On policies or renewals effective prior to October 1,
1941
17,246.88
40,426.14
Funds drawn by attorney-in-fact over and above his 35% allowed by
contract
7,664.23
LEDGER ASSETS
$152,330.98
NON-LEDGER ASSETS
Market value of bonds over book value
5,005.00
GROSS ASSETS
$157,335.98
ASSETS NOT ADMITTED
Gross premiums in course of collection effective prior to October 1, 1941
17,246.88
TOTAL ADMITTED ASSETS
$140,089.10
LIABILITIES
Reserve for unpaid claims (case basis)
$ 85,647.11
Estimated expenses of investigation and adjustment of unpaid claims
12,000.00
Estimated unearned premium deposits
40,939.27
Estimated amount due for taxes
2,497.40
Due or to become due for borrowed money secured by bonds and pledge
of savings account
49,000.00
Reinsurance premiums due
1,133.41
TOTAL LIABILITIES
$191,217.19
DEFICIENCY AS REGARDS POLICYHOLDERS
51,128.09
BALANCE
$140,089.10
2. Section 23 (e) (2) of the Internal Revenue Code provides: Sec. 23. Deductions from Gross Income. In computing net income there shall be allowed as deductions: * * *
(e) LOSSES BY INDIVIDUALS. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *↩
3. The receiver had taken the position that, since petitioners' loan of the bonds had not been disclosed in the Association's financial statements, petitioners participated in creating a false picture of the Association's financial condition and might thus be liable to those who dealt with the Association in reliance upon such misleading information. n4 Each petitioner claimed, as a loss in his 1944 return, the cost of his share of the $50,000 in bonds; and, except for a variation of two cents, that amount was identical for both petitioners, namely, $24,373.53. The respondent has not disputed the correctness of that figure as the basis for determining the loss of each petitioner. However, pursuant to petitioners' concessions, the 1944 deductions must be reduced on account of the $7,000 of bonds which had been sold in 1943. No evidence was submitted as to the cost of the bonds thus sold in 1943. On brief, petitioners seek to decrease their combined deductions by less than the full $7,000, namely, by 7/50 of the cost basis for the entire $50,000 in bonds. However, since petitioners have failed to show that they in fact paid less than the face amount for the $7,000 in bonds sold in 1943, the deductions claimed will be reduced for each petitioner by $3,500 in full.↩